May it please the Court, I represent the Bank of Utah in this matter, and the question presented here involves insurable interest. The question presented is whether the District Court erred in finding upon summary judgment, in contrast to the prior case, which was a bench trial, upon summary judgment, that there was no insurable interest in the policy taken out by Mr. Close, and also the question whether the District Court should have granted summary judgment against the Bank of Utah because there was no, should have granted summary judgment in favor of the Bank of Utah because there was no evidence in this record of a lack of insurable interest. As Justice Holmes explained more than a century ago in Grigsby v. Russell, insurable interest is required to the person taking out the policy, the life insurance policy, is not doing so as a wager, betting on and hoping for an early demise of the insured. However, once a policy is purchased by someone with an insurable interest, it is property like any other property, and it can be freely sold to anyone, including someone without an insurable interest. That's the Supreme Court of Minnesota Rader's case, that's the Grigsby case, that it is property that can be sold and freely alienated, and as the Rader's case recognized, that often you can only obtain the value from the policy by selling it to someone without an insurable interest. Well, here we have a policy purchased by Mr. Close, and Mr. Close is, of course, the insured and the person subject to the policy, and under the Christensen case, the Minnesota Supreme Court case, where the insured is taking out the policy, generally there's no need for even further inquiry on insurable interest. Moreover, we have the beneficiary of the policy being Mrs. Close, which is another classic insurable interest, the wife of the person subject to the policy, and there's no dispute if Mr. Close had passed away at any of the time while he owned the policy, during the 28 months that he owned the policy, that Mrs. Close would have been the beneficiary of the five million dollar policy. So if there was a real insurable interest when it was taken out, she is the real beneficiary, and had he died, she would have recovered under the policy. Couldn't get more of a classic insurable interest than that. So you think that's the end of the case, that even if there was an agreement that it would be transferred to CFC in two years, that it would still be good? Your Honor, of course, there's an exception for where a policy is either taken out by a stranger or the insured is acting as a straw man for the stranger procuring the policy, such as your question suggests. And this case comes down to as to whether there was, in fact, proof, at summary judgment, that this was a straw purchase on behalf of Mr. Close so that he could transfer this policy to CFC. Your hypothetical also overlooks that if he died during the contestability period, it would not be crystal clear based on what we just heard in the last case. Absolutely, but that would be true, whether the insurable interest or not. That's a separate question of contestability. And what PHL is trying to do here is after the expression, after the expiration of that contestability period, use the fact that Mr. Close was likely the source of the misstatements on the finances on his form, and they can't cancel the policy based on it because of the two years have passed. So they're trying to do so by reaching back into insurable interest, where Mr. Close takes out the policy and his wife is the beneficiary of that policy. Classic insurable situation. So under the Supreme Court of Minnesota law, the Peel case from 1939, if, in fact, the person taking it out, as Judge Colleton said, is a cover, and it really, this is a cloak, as in the Grigsby v. Holmes case, a cloak for getting it for a stranger with no insurable interest, then it's an invalid policy from the outset. So the question here is- get it for a person. You say it has to be an identified person at the time, there has to be an agreement as to a specific party that would receive the policy? That's the holding of the Paulson case, and we believe that is correct, that you could have various hypotheticals there about in the identity of the third person. It could be a group of people or et cetera. But there needs to be, as in the words of Judge Doty, a mutual intent, a preconceived agreement, the policy is going from A to B, and that you're taking out as a cover, as a straw man for, whether it be a group or an individual or a business, who is the real purchaser. In those cases, the Minnesota courts say that you, the insured, are not really taking out the policy as the good faith bona fide purchaser, you're just doing it as a cover for someone else. If we were to adopt the analysis of the Supreme Court of Delaware in DAW, would your, what impact on this case would that have on your argument? Well, even in that case, they still looked as to whether there's a preconceived... They certainly didn't require a preconceived agreement or identifiable third person. Well, they need to have, under Minnesota law, we know that the legislature has just ratified... You don't concede you lose if we follow DAW. We don't concede that, and there was different factors in DAW about the intent in that case. But let's look at the... Do you think the district court applied the legal standard that you say should be applied, and the problem is just that you think there are disputed facts, or do you think the district court had a different intent standard? Well, the district court and PHL, to go through the charade of adhering to the Paulson standard. So the parties agreed that the Paulson standard was a correct interpretation of Minnesota law, and Paulson requires there to be a mutual intent, a preconceived agreement between the parties. But if you look at the intent between the parties here, there is no mutual intent to move the policy from Mr. Close to CFC. Indeed, the evidence here, to the extent we have any evidence about what was intended by Mr. Close, is that he took out this policy with the hope and the expectation of selling it on the secondary market. That was the testimony of Mrs. Close. That was the testimony of the agent, Mr. Friedman, who sold him the policy. So he didn't have any intent to transfer the policy to CFC. And we know it wasn't just, you know, the key point is at the outset when he took it out, but a further point of evidence is that he tried to sell the policy. He instructed Mr. Friedman, when the two years was coming up, to try to sell the policy on the secondary market. So you say if his intent at the beginning, if CFC intended that he would sell it to a third party, and he intended that he would sell it to a third party, the exception doesn't apply as long as it's a third party on the open market? Well, Paulson says that. We think that's right. But there's no evidence about CFC having intent, whether he's going to sell it on the open market, or if he's going to refinance it, or if he's going to use his own assets to pay for it. There's simply no evidence regarding that whatsoever. But it would be natural for a party like CFC, the lender, to expect that this policy, if it's worth $1 more than the loan, that it's not going to be turned into CFC. Because that's economics 101, that if it's worth more than the loan, you're going to sell it on the secondary market, or you're going to refinance and keep it yourself. Or if you know you're sick, you might refinance or use your own assets to pay for the policy. There's no reason CFC would expect to have this policy back absent market failure. And certainly, CFC didn't have a crystal ball back when this policy was issued, knowing that it would, at the end of the day, end up with the policy. But the district court here found, I mean, there's no mutual intent. So on one hand, we have an intent by Mr. Close, to some degree, that he intended to sell this, or an expectation he would be able to sell this on the open market, which is a $20 billion secondary market in these insurance policies, and hopefully profit on it. And then you have CFC, who is a lender on it. And there's no evidence that they had any conspiracy or preconceived agreement that this policy would end up with CFC, or sold on the secondary market. They had no, there's nothing to suggest they had any knowledge whatsoever about Mr. Close's plans were. You haven't talked about Newsstream's effective control of all this. There is no evidence, at Summary Judging in particular, to show Newsstream's control over this. What we have is a letter from CFC, the lender, to Mr. Close at page 943 of the record, saying to him, hey, the two years is coming up, you can refinance with us. Then we have a letter being sent from BNC, the trustee, who is supposedly also on this massive conspiracy, spelling out four options for Mr. Close. To refinance with CFC, to refinance with someone else, to repay with other assets, to sell it on the secondary market. There's no suggestion he's being forced into turning this policy over to CFC. The lender agreement didn't provide for turning over the policy to CFC. There's nothing in this record to suggest this grand conspiracy in the case, and particularly at Summary Judgment, to rule against the Bank of Utah in this circumstance. We think it was wholly inappropriate, Your Honor. Whose agent was Friedman? Well, Friedman is someone who's authorized to sell the policies by PHL and to submit just like we talked about in the prior case. He testified he had no relationship with CFC, no kickbacks from CFC, no relationship with CFC or from NewsStream. So there's no way you can make a finding of fact that he is acting on behalf of CFC. And Judge Loken, let me make this point, too. There's nothing to support all these conspiracy theories, but if they were true, it has nothing to do with insurable interest. This case is about whether the person took out the policy, has an insurable interest, an interest in the ongoing life of— It has everything to do with it under the analysis in Daw. Well, in that respect, we would— Which focuses on the purported insurer's intent at the time the policy is taken out as opposed to a decision even the day after a valid policy issue is to sell it. Right. And there's nothing in this case, contrary to Daw, to suggest that there was any agreement that Mr. Close— We know Mr. Close didn't want the policy to go to CFC. He was upset when it had to go to CFC. He got an extension of time to sell the policy in the secondary market. So unlike Daw, where there was suggestion that there was a— the cahoots to begin with, that they always knew it was going to go to the lender, and everyone understood that, there is nothing in this record to suggest that. But if Mr. Friedman was trying to sell— He said, I'm going to sell this policy in the secondary market and then failed to do or if there was some agreement with CFC to basically just go through the motions and not do it, it may be that Mrs. Close and the Close estate has a variety of legal actions they could take against CFC and Mr. Friedman for breach of fiduciary duty, for interference with contract, for the interference with their ability to alienate this policy, or violation of financial rules. But none of that has to do with insurable interests, which is what the district court here said. They said at the inception here, there was always a plan to get this policy from Mr. Close to the lender. And where we have— the only evidence in the record about what was motivating Mr. Close was to sell it on the secondary market and do it at a profit. And finally, in our brief, we go through in detail about all the fact-finding that was done at summary judgment by the district court here. So we think, as a matter of law, you need a reversal and entry of judgment for our client here. But in no way can this decision be upheld because in summary judgment, the district court made fact-finding after fact-finding and took inference after inference against a non-moving party. Let me just identify one or two. The district court said that Mr. Close had no risk involved in this policy at all and therefore that was evidence there was no insurable interest. At page 804, the record shows that he had a personal liability of $92,000 on this policy. At page 796 of the record, it says that if there was fraud involved in the application, he would be 100% liable on the policy, which would be over $300,000. And there was fraud in the application here because he put in false information. So that is just fact-finding at summary judgment. There's facts that Mr. Close surrendered the policy when he could have sold it and really should have been able to sell it. That's a fact-finding by the district court that Mr. Friedman's a liar. You know, he said he tried to sell it on the open market. He was unable to do so due to the market failures. We have other documents we submitted to support Mr. Crane's testimony that there was this market failure at the time and there was no basis to enter summary judgment and make fact-findings about that. The district court believed that Mr. Friedman must have known about the cancer and would have been able to sell it. In reality, the medical information which was faxed to Mr. Friedman and most showed that there was some growths on the lungs, some masses, which was the long fax set, and recommended that he get an additional CAT scan. Mrs. Close said that she believed at the time he was healthy. Mr. Friedman testified in his deposition that he was mostly healthy. At summary judgment, you can't say all these people are liars, Your Honor. I could go through about five or six other instances. We put them in our brief, but I'll reserve the rest of my time for rebuttal on that. Thank you. Mr. Hetherington. Thank you, Your Honors. May it please the Court. Your Honors, I argued the Daw case to the Delaware Supreme Court, and that case is exactly like this one. The investor in that case, G3, has had a similar program to the investor in this case, New Stream. These premium financing programs are shams to takeover policies. That's all they are. And the facts in this case are completely conclusive on that. This fact issue stuff at the end of the brief, it's only because they view the standard of Minnesota law incorrectly, and they view it through their own lens. And so they say, well, there must be fact issues. What do you think the standard is under Minnesota law? I had a little trouble discerning that from your brief as to what the mutual intent has to be. Well, I think mutual intent comes from Paulson trying to figure out what the Minnesota Supreme Court would be. I think the standard under Minnesota law is exactly what it was under Daw, which relied on old common law in reaching its conclusion. Can you give me a one-sentence statement as to what the standard is? Sure. The policy has to be procured in good faith for a legitimate insurance purpose and not as a cover for a wager. That is the standard under Minnesota law, and it's the standard in almost every state in this country. And if you look at Christensen, it talks about the continuation of life. It talks about how when you take out insurance, if you look at the footnote of the Paulson opinion, it talks about something that is intended to dampen the risk versus to permit speculation. These programs allow hedge funds to speculate on the lives of older Americans. I wonder if the way you stated it is too broad, because that would seem to apply just when the insured on his own unilateral initiative wants to sell it as a wager. The other side has to be involved. I thought even you agreed with that in your brief. Oh, I do. So what is the mutual intent? Well, the mutuality comes from Paulson, and that's where the big dispute about Paulson is. The holding of Paulson is that there has to be a mutual intent to evade the law against wagering contracts. That's exactly what the case says. The preconceived agreement idea is an example of how you might find that intent, and that's consistent with the secondary sources Judge Doty cited in that opinion. So it's the mutual intent to evade the law against wagering contracts. Judge Montgomery did exactly what they wanted her to do. She looked at the standard and applied mutual intent. They just don't like the fact that the facts show that there was a mutual intent to evade the law against wagering contracts. What they want you to do is exalt a form over substance approach, the exact same thing that was argued in Dahl and in numerous other courts around the country, to say we need a bright line test. And the reason we need one is so we can paper around it. Because if we set up these complex transactions, you heard him, he just got up here and he said Mr. Close took out a policy on his life and his wife is the beneficiary. Not true. A trust procured this policy and the trust is the beneficiary of the policy. The trust was created by guess who? The investor. There's two trustees. They both report to the investor. The trust was planned to be terminated in two years. This isn't a case of Mr. Close deciding I want insurance. I want it for a legitimate need. I want to protect my family if something happens to me. You can help me think this through. Suppose the insured person says I want to get a policy and I want to sell it on the open market after two years. That's my only interest in having this policy because I think I can make money off it on the open market and I got a lender who's willing to finance that for me for the two years so I can then make the transaction. Would that violate Minnesota public policy? It would if there was another party, according to Minnesota law, that was wagering on the life of the insurer. The other party in my hypothetical is unknown at that time. It's going to be whoever wants to take the bet in two years. Say it's a captive state farm agent. It's a captive state farm agent. It's exactly what the court did here. You have to scrutinize the circumstances of the transaction. Under your hypothetical, Your Honor, if Mr. Paulson had done this using premium financing, I think the transaction would be fine. He was an individual with a means to pay for the policy. He had his own individual unilateral intent to transfer a policy and there's no question that somebody's own life can sustain an insurable interest. That's why Judge Montgomery looked at the factors that courts around the country, including Dahl, have looked at. If you don't have the ability to ever pay for the insurance, you can't have the legitimate decision, you know, I'm going to commit fraud and use a premium finance loan to take out this policy so maybe I can make a buck down the road. That's when it becomes a wager. Really, I think the most illustrative part of Minnesota common law on this is actually this court's opinion in Bankers Reserve. It's an opinion that arose under Arkansas law, but Arkansas law, like almost every state in the union, its common law developed lockstep with the common law in Minnesota and the federal common law, Warnock v. Davis and Grigsby v. Russell. And in that case, the court actually makes clear that it's not, this court makes clear that it's not going to endorse a form over substance approach. It says in Bankers Reserve, you can't just look at the beneficiary on paper because the intent may be to do something else with it. And it emphasizes good faith, which brings me back to DAW. DAW says over and over and over again, it has to be a bona fide transaction. There has to be good faith. There has to be a reason for taking out the insurance. That's the purpose of insurance, you know, overall, your honors. Insurance is considered a social good because it protects against loss. When you use it as an ability to wager, it becomes a problem. It violates longstanding insurable interest law. So all of this is a modern twist on a problem that we've been having in this country for 200 years. And there's case after case after case, including all the ones cited in our brief in Minnesota, Christensen, Peel, Raiders, and this court's opinion in Bankers Reserve that support the result reached in this case. Well, in the record, in this case, in this summary judgment record, what do we see here that Mr. Close did not understand? That he didn't understand? He did not understand about this whole structure that he was made a part of. I think he understood it perfectly well. His intent was, and it's not even disputed on Mr. Close's side of the transaction, his intent was to sell the policy and to make a buck. That's how it was presented to him. That's what his wife said. I understood right up front it was going to be sold and there was going to be a third party. And they said, like they always do, just like with Ms. Joseph, sign here, you know, sign this trust agreement, appoint your trustee. Now, would any wealthy person really wanting to take out an asset for themselves appoint the bank's trust protector and an administrative agent for the lender? Those are the two people that control this trust. There's no... You say if he had done all that with his own money, that would be not against public policy. What is it that makes it against public policy? I think it would be against public policy. And I think that the older cases support that. But the test conceived by Judge Doty and Judge Montgomery suggest that if you're preying on seniors who couldn't properly procure the insurance, then that is a factor to consider. And DAW considered that. It said, you know, who's paying the premiums here? What if he just said, I want to do this with my own money. I don't have enough money, but I can get somebody to lend it to me. But I'm not going to sell it to them. I'm just going to borrow from them and then sell it on the open market. I still think it's a cover for a wager because he's not taking out insurance to protect against an identifiable loss. He's taking it out to speculate. Now, you could argue. But see, that's the struggle. If he did that with his own money, then the question is, at what point does the third party's involvement make it void against public policy? But I think the own money issue raises the mutuality question, which is what Judge Doty came up with when he looked at Paulson. Remember, Paulson was an early case. Judge Montgomery had years of additional cases to look at. You know, Paulson didn't involve STOLI under one of these programs because the policies were purchased in 02 and 04. These things really started late 04, 05. And so what you had was a wealthy person saying, I'm going to do this, and I want to sell these things down the road. I think under the longstanding Minnesota case law, including Peel and this court's opinion in Bankers Reserve, that's not a transaction made in good faith, which is the touchstone in Minnesota. But courts struggle with that, just like you're struggling with it, Judge. And the reason you look at whether they can afford to pay the premiums is it shows that there's a wager. Judge Montgomery said there has to be a wager. These people do no loan underwriting. Look at the facts of this thing. It's egregious. They signed a collateral assignment. That's a document you give to the insurance company to show you have an interest in the policy as a lender on August the 10th. The loan application wasn't even signed until August the 17th by Mr. Close. They decide with no underwriting, no questions. On August the 18th, they send him a summary of the term financing facility. And on August the 20th, he signs the financing agreement. There's no underwriting here done. It's a total smokescreen. They install a guy that's the trust protector on all their trusts. And then they get a credible bank who's both their administrative agent and the administrative trustee with no authority to be on the documents. If you look at the trust agreement, the bank signs for both sides of the transaction. Then in the schedule of loans, they say, we're going to go ahead and terminate up front. We're going to... It seems to me that you got to have a link to new stream here because the bank's just a premium financing company can do all this. Apparently, it's unclear in the record whether maybe Close intentionally made the misrepresentations that made the policy avoidable for fraud. So it seems to me, unless you can establish that new stream's interest in promoting, fomenting a viable secondary market in which it makes a lot of money as a hedge fund, you don't have the mutuality link. And I don't see how you get there on summary judgment. Well, CFC could have been the wagerer, right? But CFC and new stream are the same. New stream owns CFC. It ended up buying them. It funded everything. I'm accepting it for at least as plausible your theory. And I've read Dawn and they do a very extensive analysis to this end. But then I think summary judgment on if you have to have the mutuality just to make sure that it isn't someone... That's probably the end of the story. If he isn't wealthy enough, but he's willing to lie on the application in order to get something that he wants to sell, that's fraud. But that's not the public policy that we're worried about. So you have to loop in another party. Well, yes, Your Honor. But the summary judgment piece is a little bit of a red herring here. This is an equitable issue involving public policy. And they can point to nothing in the record. They say it's not fair that this was resolved on summary judgment. If we just have a dishonest insured and people that were willing and a bank that was willing to lend them the money and a trust device that's set up for estate planning purposes of which we are unaware, I'm back to where Judge Collins' question. It may be fraud, but how does it violate the wagering public policy? I would encourage you to go look at this court's opinion in Bankers Reserve versus Matthews, where the court said, if at inception, an assignment was contemplated by the insured, contemplated by. This whole mutual intent standard came up as a way to deal with it. That ignores the mutuality. That destroys the secondary market, if that's the law, which is what the amicus has warned us about, right? Nothing about sham premium financing transactions is going to destroy the secondary market, Your Honor. If wealthy people, and they say in their brief, wealthy people who need estate planning use premium financing. You're talking about sham. You just said the intent at the outset, focusing on close. Well, you've got close's intent, which is undisputed in this case. He wanted to get rid of the policy. He took it out as a wager on his own life. And set up this trust to do it. Again, remember- And he had an insurable interest. But the trust is procuring this policy. He didn't have insurable interest because there was a lender on the other side of the transaction who set this policy up to own it from day one. Think about this, Your Honor. Is that what it comes down to, whether the lender set it up to own it itself? I don't know that it comes down to that, but I think that's the evidence of the wager. Judge Montgomery was looking for a wager, and she found one. I've got another question. Whether they set it up to own it themselves, or they set it up so that he could sell it however he wished. And it's not just the lender, because the opposing counsel says it's obvious that close didn't want CFC, the lender, to own it. I don't think the law, according to Judge Doty, is that the mutual intent has to be to evade the insurable interest requirements. It doesn't matter if he wanted close to own it or if he wanted to sell it. Both parties intended to gamble, and that's why it violates public policy. Any premium financing company that knows the prospective insured has the intent that you say is undisputed close had has created a policy for which there was no insurable interest. Well, not necessarily, if the transaction is legitimate. What makes it legitimate? These cases have people dying, and the policies are already gone. They're in the hands of the lender. They get nothing for them. This isn't—you can't just surrender a policy. They don't do a foreclosure. They don't have a commercially reasonable sale. They don't give the difference to the trust, because it's their trust. They set it up. The whole transaction is designed to put the policy in the hands of the investor, which is exactly what happened here, which is why CFC policies are—their bankruptcy filings are riddled with their policies. That's what happened here. This is a wager. It violates longstanding Minnesota law. The decision is thoughtful. It factors in the factors that have been considered by courts around the country, and it should be affirmed. Thank you, Your Honors. Thank you. Just a couple of points in reply. Let me just return to the Daw case. And Judge Logan, you said it's on Hall 4's here, but it's a key distinction. No, opposing counsel. Yeah, I don't think the— Well, Judge— All right. So the language of Daw is, Daw never intended to retain the policy and always, always intended from the inception to immediately transfer the policy to an unrelated third investor, not anybody, but G3, the private investing entity. So this is your classic cover agreement. There was a preconceived agreement between Daw and G3 to take out the policy and to transfer that policy immediately, in the words of the Daw Court, to the investor. So that's a classic Stoley-Strawman purchase. That's not what we have here. As your questions to opposing counsel show, Mr. Close never intended to transfer this policy to CFC. He tried to sell it on the secondary market. They argue the premium financing here is a fraud and that it's basically always a fraud in these kind of cases. And that's not— They issue this policy knowing that there was premium financing, knowing that the CFC was lending the money, knowing that CFC was taking a collateral security interest in the policy. That's no surprise. And they didn't view that as a sham or improper. They issued the— It's on their forms for a place to put in the premium finance lender. They approved this policy knowing all that. For them to now say that is per se fraud and a sham agreement is remarkable. And as your question suggests, this rule that they're arguing is going to destroy the alienability of insurance policies, which has been recognized since the Raiders case and since the Grigsby case. This is property that can be alienated. No one will want to buy an insurance—life insurance policy if this kind of fuzzy standard is hanging over the head of the policy because even after the— His concern is if it's a clear standard like you suggest, then it's too easy to get around it and it's too easy for these shams to be created without clear enough intent to void them under public policy. So how do you address that? What do you think the rule should be? And how does that serve the policy concerns? The question is, in all these cases for more than 100 years, has been, is the transaction a cover for just a wager contract where the person is actually the straw man? That's an issue that comes up in a variety of legal contexts where someone is not allowed to do something directly, uses someone else to do it for them. And that's the kind of question here. That was in the Daw case. They found in that case there was a—the fix was in from the beginning to immediately transfer it to the investor who was a stranger and could not buy it on its own. They keep bringing in other factors and other equities and other policies. They don't like premium financing, although they benefit from it all the time. I understand. And our standard is the Paulson case. You are allowed to transfer the policy on day two. Your time, sir. Thank you, Your Honor. We appreciate your time on both cases. Both cases have been well-briefed and argued and raised difficult questions. We'll take them under advisement.